Joaquin Andres Acosta
c/o PO Box 2889
Big Bear, California
　　　　Postal Zone 92315

Phone  909-744-4500
No Fax

In Pro Se

FILED

SEP 1 4 2015

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:＿＿＿＿＿＿
Deputy Clerk

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Joaquin Andres Acosta, | Case # |
| 　　　　　Plaintiff, | BK Case No# 6:14-bk-12539-MJ |
| vs. | **VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta CIVIL RICO 18 U.S.C. 1962, 1964 (c)** |
| MATTHEW J. MARNELL; in his individual capacity; | |
| JEAN RENE BASLE, in her individual capacity; | |
| S MARK STRAIN, in his individual capacity; | **A SEVENTH AMENDMENT A TRIAL BY JURY DEMANDED** |
| RUTH E STRINGER in her individual capacity; | |
| SAN BERNARDINO COUNTY; | |
| THE COUNTY OF SAN BERNARDINO; | |
| DAVID COHN, in his individual capacity; | **JUDGE:    MERIDETH JURY** |
| TERA REILEY in her individual capacity; | **TRUSTEE:  TODD A. FREALY** |
| ROBERT A LOVONGOOD, in his individual capacity; | |
| JANICE RUTHERFORD, in her individual capacity; | |

1

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

capacity; )
**CHET HALMAN, in his individual** )
**capacity;** )
**JOSIE GONZOLAS in her** )
**individual capacity;** )
**CORWIN PORTER, in his** )
**individual capacity;** )
**TOM HUDSON, in his individual** )
**capacity;** )
**THE CITY OF BIG BEAR LAKE, A** )
**CHARTER CITY OF THE STATE** )
**OF CALIFORNIA;** )
**FRANK C. ADAMS, in his individual** )
**capacity;** )
**CATHY TA in her individual** )
**capacity;** )
**DAVID CARETO, in his individual** )
**capacity;** )
**BILL JAHN, in his individual** )
**capacity;** )
**BOB JAKOWSKI, in his individual** )
**capacity;** )
**RICK HERRICK, in his individual** )
**capacity;** )
**RANDALL PUTZ, in his individual** )
**capacity;** )
**and DOES 1 through 10 inclusively;** )
)
**Defendants.** )
)

1.    Plaintiff, Joaquin Andres Acosta (Hereinafter, "Plaintiff Acosta") makes the following Declarations in support of this his ADVERSARIY PROCEEDING:

2.    This document relates to all private land owned by Plaintiff Acosta and his Businesses which are located within the known as the CITY OF BIG BEAR LAKE and the original, underlying, Constitutionally valid 1853 A.D. San Bernardino County, and the 1849 A.D. California Republic.

///

2

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

## JURISDICTION

Competent Jurisdiction for this UNITED STATES BANKRUPTCH COURT Action is found in the 1787 A.D. Constitution for the United States of America, its SUPREMACY CLAUSE found at Article VI, Paragraph 2, its First, Fourth, Fifth and Seventh Amendments, the 1848 A.D. International Treaty of Guadalupe Hidalgo and its Protocol of Queretaro, the United States Land Patent Laws, the Congressional Township Survey Laws, the UNIFORM COMMERCIAL CODE, and CIVIL RICO 18 U.S.C. 1962, 1964 (c)

## PARTIES

3.    Plaintiff Acosta, at all material times mentioned in this ADVERSARY PROCEEDING, lived and worked in the original, underlying, constitutionally valid 1853 A.D. San Bernardino County, and the 1849 A.D. California Republic state.

4.    All named human Defendants mentioned in this ADVERSARY PROCEEDING, live and work in the subsequent, overlapping, defacto 1912 A.D. COUNTY OF SAN BERNARDINO, 1879 AD. STATE OF CALIFORNIA.

5.    Regarding DOE Defendants, Plaintiff Acosta does not know the true names and capacities, whether individual, corporation, associate or otherwise sued herein as Does 1 through 10 Inclusive. Plaintiff Acosta will seek leave of court to amend this ADVERSARY PROCEEDING to allege such names and capacity as soon as they are ascertained.

6.    Agency/Co-Conspirator Status, Etc. Plaintiff Acosta is informed and believes, and thereon alleges, that at all time mentioned therein, each of the therein described DOE-Defendants, were at all times therein mentioned, acting within the course, scope, purpose, consent, knowledge, ratification, and authorization of such private, non public agency, employment, joint venture and thus in their individual and private non-governmental conspiracy.

7.    Agency Status of Co-Defendants, Each of the named Defendants, whether specifically named or as DOE Defendants, were at all times herein mentioned, the

3

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

1  private, non public agent, servant, employee, partner, franchisee and/or joint venture of
2  each of the other named Defendants, and at all times were acting within the course and
3  scope of such private, non public agency, non-governmental service, employment,
4  partnership, franchise and/or joint venture.

5      8.     At all relevant times, the named Defendants have engaged in a
6  conspiracy, common enterprise and common course of conduct, the purpose of which
7  was and is to engage in violations of well-settled American Law and Jurisprudence as
8  alleged in this ADVERSARY PROCEEDING and in its attached Affidavits as though
9  fully presented hereat. This conspiracy, common enterprise and common course of
10 conduct affects international trade and continues to the present day against Plaintiff
11 Acosta, his family and his well established (for 35 years since 1980 A.D.) Public
12 Service businesses.

### COURT VENUE

13     9.     The violations of law alleged in this ADVERSARY PROCEEDING
14 occurred in THE 1853 A.D. San Bernardino County, California. Venue of this Court is
15 proper because the acts complains of herein occurred within this judicial district and all
16 predicate Racketeering acts which are complained of herein were performed by each of
17 the named Defendants within this judicial district.

18     10.    ALL named human defendants are herein sued *in their individual*
19 *capacity* and NOT in their official capacity as the Sovereign People of the State of
20 California for whom they work DID NOT hire them to violate their OATH OF OFFICE
21 and well-settled American Law and Jurisprudence against them.

### 1879 A.D. CONSTITUTION FOR THE STATE OF CALIFORNIA
### ARTICLE XX, SECTION 3.
### OATH OF OFFICE

**Paragraph No. 1.**
**Members of the Legislature, and all public officers and employees,
*executive, legislative, and judicial*, except such inferior officers and
employees as may be by law exempted, *shall*, (shall means mandatory)**

4

before they enter upon the duties of their respective offices, take and subscribe the following oath or affirmation: (Emphasis added)

**Paragraph No. 2.** (First paragraph of the required <u>OATH OF OFFICE</u>) "I, _____, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of California against all enemies, foreign and domestic; that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of California; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter.

**Paragraph No. 3.** (Second paragraph of the required <u>OATH OF OFFICE</u>) "**AND I DO FURTHER SWEAR (OR AFFIRM)** THAT I DO NOT ADVOCATE, NOR AM I A MEMBER OF ANY PARTY OR ORGANIZATION, POLITICAL OR OTHERWISE, THAT NOW ADVOCATES THE OVERTHROW OF THE GOVERNMENT OF THE UNITED STATES OR OF THE STATE OF CALIFORNIA BY FORCE OR VIOLENCE OR OTHER UNLAWFUL MEANS; THAT WITHIN THE FIVE YEARS IMMEDIATELY PRECEDING THE TAKING OF THIS OATH (OR AFFIRMATION) I HAVE NOT BEEN A MEMBER OF ANY PARTY OR ORGANIZATION, POLITICAL OR OTHERWISE, THAT ADVOCATED THE OVERTHROW OF THE GOVERNMENT OF THE UNITED STATES OR OF THE STATE OF CALIFORNIA BY FORCE OR VIOLENCE OR OTHER UNLAWFUL MEANS EXCEPT AS FOLLOWS:

(IF NO AFFILIATIONS, WRITE IN THE WORDS "NO EXCEPTIONS") AND THAT DURING SUCH TIME AS I HOLD THE OFFICE OF _____

_____ I WILL NOT ADVOCATE NOR BECOME (NAME OF OFFICE) A MEMBER OF ANY PARTY OR ORGANIZATION, POLITICAL OR OTHERWISE, THAT ADVOCATES THE OVERTHROW OF THE GOVERNMENT OF THE UNITED STATES OR OF THE STATE OF CALIFORNIA BY FORCE OR VIOLENCE OR OTHER UNLAWFUL MEANS." (Emphasis added)

**Paragraph No. 4.**

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

**AND NO OTHER OATH**, declaration, or test, **shall be required (mandatory) as a qualification** for any public office or employment. (Emphasis added)

**Paragraph No. 5.**
"Public officer and employee" *includes every officer and employee of the State*, including the University of California, every county, city, city and county, district, and authority, including any department, division, bureau, board, commission, agency, or instrumentality of any of the foregoing. (Emphasis added)

11.    Not one of the named human Defendants have sworn or affirmed and then subscribed (signed) the above cited and current OATH OF OFFICE, nor were any of them a party to any past court case that might have relieved them from such constitutionally mandated OATH OF OFFICE. (See TARA REILLY and DAVID COHN'S invalid, incomplete, one paragraph, OATH OF OFFICE (Attached)

12.    Demand is hereby made for all human defendants to NOT be represented by any governmental entity, as they are sued *in their individual capacity* and NOT in their official capacity and are to hire their own non-governmentally financed attorney's as does Plaintiff Acosta, AGAIN as they have NOT been sued in their official capacity, but as private street people who are herein charged with impersonating governmental officers, agents and employees.

13.    Demand is hereby made that it be recognized that all named defendants are NOT sued for ANY action or activity done within the valid official jurisdictional scope of what might be considered as a governmental office or agency, but for actions or activities that were maliciously done while in the provable "clear, total, and complete absence of all Subject Matter Jurisdiction," that can and will be proven in the Demanded and upcoming Seventh Amendment Trial **BY** a Jury of Plaintiff Acosta's Land owner peers *from the neighborhood* who will be charged with judging BOTH the Law AND the Facts with absolutely NO possible Administrative-Law Appeal pursuant to the mandates of the Seventh Amendment to 1787 A.D. original Constitution for the

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

United States of America, and as the lasts of the American governmental system of CHECKS AND BALANCES against bad laws, and where the Judge merely sits to maintain procedural order.

## AS TO FORM

14.    While Plaintiff Acosta has attempted to draft, file, and serve this ADVERSARY PROCEEDING according to his best knowledge, information, and belief the Format that he has used is protected by the historic American Law of the Land, and its Common-Law, and related historic American Law and Jurisprudence, and he sincerely believes that he can justifiably rely, if necessary, on the old MAXIM that clearly states: **"Substance is more important than Form."** He also believes that he can also justifiably rely on the UNITED STATES SUPREME COURT Case, entitled, <u>Haines v. Kerner,</u> 1972, 404 U.S. 519, 30.L. Ed. 2d 652, 92 S. Ct, 594, 496, Reh. Den., 405 U.S. 948, 30 L. Ed. 2d 918, 92 S, Ct, 963, which clearly states, to wit:

> **"Pro Se complaints are held to less stringent standards than formal pleadings by lawyers, and regardless of who represents the Plaintiff a motion to dismiss is not to be granted <u>*unless it appears beyond doubt*</u> that the Plaintiff can prove no set of facts which would entitle them to relief."** (Emphasis added)

## <u>NEWLY DISCOVERED MATERIAL INFORMATION</u>

15.    Plaintiff Acosta has very recently Discovered that all named defendants have demonstrated their ignorance regarding the awesome historic power of the still valid UNITED STATES LAND PATENT laws that FOREVER protected and still protects his private land. Therefore, at this late date, what Plaintiff Acosta did or did not do in the past is irrelevant and immaterial to the issues to be adjudicated by the instant SEVENTH AMENDMENT, TRIAL <u>BY</u> JURY, ADVERSARY PROCEEDING.

16.    The relevant and material issues to be adjudicated herein are what the Named Defendants either did, or failed, refused, or neglected to do pursuant to the mandates of well-settled American Law and Jurisprudence presented herein, and that

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

ALL of their acts or actions were TOTALLY WITHOUT ANY Subject Matter Jurisdiction which made such acts or actions not merely voidable, but completely VOID ab initio. Thus this ADVERSARY PROCEEDING is NOT to be considered as some type of an appeal or defacto appeal of a valid state court case which could invoke a Rooker/Feldman Doctrine Immunity or Defense, which are issues to be FOREVER judged by Plaintiff Acosta's Trial BY a Jury of his Land Owner Peers *from the neighborhood* who are constitutionally mandated to judge BOTH the Law AND the Facts, with NO Administrative-Law Appeal available pursuant to the clear mandates of the Seventh Amendment to the original 1787 A.D. Constitution for the United States of America, which all named defendants swore, or affirmed and then subscribed (signed) regarding their constitutionally mandated OATH OF OFFICE.

17.    Plaintiff Acosta hereby gives notice that each and every issue presented herein must be squarely faced and addressed on and for the record per United States Supreme Court case:

**"Silence can only be equated with fraud when there is a legal or moral duty to speak, or when an inquiry left unanswered would be intentionally misleading... We cannot condone this shocking conduct... If this is the case we hope our message is clear. This sort of deception will not be tolerated and if this is routine and should be corrected immediately."** US v. Tweel, 550 F2d 297, 299 – 300.

### TO DEFENDANTS AND DEFENDANTS' PRIVATE ATTORNEYS REGARDING FRAUD UPON THE COURT

**"A judge is an officer of the court, as well as are all attorneys. A state judge is a state judicial officer, paid by the State to act impartially and lawfully. A federal judge is a federal judicial officer, paid by the federal government to act impartially and lawfully. State and federal attorneys fall into the same general category and must meet the same requirements. A judge is not the court."** *People v. Zajic, 88 Ill.App.3d 477, 410 N.E.2d 626 (1980).*

**"Whenever any officer of the court commits fraud during a proceeding in the court, he/she is engaged in "fraud upon the court".** *In*

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

*Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985)*, **the court stated "Fraud upon the court is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. It is where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function thus where the impartial functions of the court has been directly corrupted."**

***"Fraud upon the court"*** has been defined by the 7th Circuit Court of Appeals **"to embrace that species of fraud which does, or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication."** *Kenner v. C.I.R., 387 F.3d 689 (1968); 7 Moore's Federal Practice, 2d ed., p. 512, ¶ 60.23.* The 7th Circuit further stated **"a decision produced by fraud upon the court is not in essence a decision at all, and never becomes final.**

## GENERAL ALLEGATIONS

18.    Plaintiff Acosta is now and for several years suffering from VOID, and NOT VOIDABLE (a legal distinction being made) Code Enforcement and related alleged state court Process by ALL of the named Defendants in conspiracy with the major perpetrator, Defendant MATTHEW J. MARNELL. Such actions have adversely effected the title to his business and private land as mentioned above.

### The CALIFORNIA STATE and UNITED STATES LAND PATENTS.

19.    Plaintiff Acosta has very recently become involved in a 37-year legal research study that has shown that all (repeat ALL) "private land," such as his, has ALWAYS been protected against ANY AND ALL State regulatory AND judicial authority via the protections and prohibitions related to the historic and still valid CALIFORNIA STATE and UNITED STATES LAND PATENTS. These Land Patents were governmentally issued during the original Quitclaim transfer of ownership from the STATE OF CALIFORNIA and/or the UNITED STATES, DEPARTMENT OF THE INTERIOR'S GENERAL LAND OFFICE (the GLO), to the private sector with

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

their own Quitclaim transfer Land Patents. It should be noted that absolutely NO NEW self-generated, self-serving Land Patent has been attempted, created, recorded, or filed on the subject Big Bear Lake land by Plaintiff Acousta or anyone else. It is *THE ORIGINAL*, government issued Land Patent, issued FOREVER many years ago that is hereby placed in issue.

## THE 1848 INTERNATIONAL TREATY OF GUADALUPE HIDALGO

20.    There were approximately 720 Spanish and Mexican Land Grants that were incorporated into the mandates of the 1848 A.D. International Treaty of Peace with Mexico also known as the TREATY OF GUADELOUPE HIDALGO. Said "SUPREME LAW OF THE LAND" document called for the UNITED STATES (government) to FOREVER "recognize" those earlier foreign government Land Grants with a UNITED STATES LAND PATENT. The subject research study indicates that those original Spanish and Mexican Land Grants were actually required to be "recognized" and "confirmed" via special UNITED STATES GENERAL LAND OFFICE, (GLO) Confirmation Hearings, with any possible with Appeals to the then DISTRICT COURT OF THE UNITED STATES, whereby the UNITED STATES (government) would finally issued its UNITED STATES LAND PATENT. The subject action, in addition to "recognizing" and "confirming" the *surface rights* that were formerly granted in the original foreign government's Land Grants, also ADDITIONALLY "granted" and "transferred" to the original grantee or assigns ALL of the *sub-surface rights* to the center of the Earth, sub-surface rights that had been originally kept by those foreign governments. In other words, those original Land Grant Grantees and assigns had a higher form of ownership with the UNITED STATES LAND PATENT than they did with their original Spanish or Mexican Land Grant.

## THE UNLAWFUL STANDING OF THE INVOLVED DEFENDANT PUBLIC SERVANTS.

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

21.     Plaintiff Acosta has also very recently discovered that most, if not all of the California Public Servants who have become involved in their pretended jurisdiction over the subject private land, **HAVE NOT** lawfully qualified to have any "lawful standing" for their claimed office or authority, by swearing or affirming and then subscribing (signing) the California Constitutionally mandated OATH OF OFFICE and thus may be, and are hereby accused of impersonating an official state officer - a state crime.   Plaintiff Acosta is prepared to prove in this action, that the unlawful actions committed by such "persons" are NOT covered by any form of immunity, such as Absolute Judicial Immunity, Quasi-Judicial Immunity, Qualified Immunity, Police Officers Immunity, Good Faith Immunity, or even Eleventh Amendment Immunity.

22.     In general, there are many Street People unconstitutionally masquerading as governmental officers, agents and employees who are increasingly usurping more and more powers and authority than were ever officially delegated to real officers, agents or employees of the local governments by the Sovereign American People of California. It also appears that the official training and discipline of these alleged Public Servants is severely lacking in constitutional issues and safeguards along with the ignorance of the still valid decisional case law that interpreted those issues and safeguards.   Many of these "Street People" have not even read the state and federal Constitutions since their days in high school and college, if then, and yet they are required by said Constitutions to take an "OATH OF OFFICE" *"to support and defend the Constitution of the United States and the Constitution of the State of California,"* which reads in part: *"that I take this* [entire two paragraph] *obligation freely, without any mental reservation or purpose of evasion;"* BEFORE (Emphases added) they may "qualify," (See Article XX, Section 2, paragraph 4 of the 1879 A.D. CONSTITUTION FOR THE STATE OF CALIFORNIA) to have ANY standing to enter their office in an official capacity.   Therefore, it appears that these OATHS OF OFFICE are being administered and taken without the "Street People" knowing, or understanding the express Constitutional restrictions, prohibitions, and safeguards built into said

11

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

documents.  In fact, with obvious contempt, many of these same alleged officers, agents, and employees, often refer negatively to those Sovereign American People of California who DO read, study and comprehend those state and federal Constitutions, as "Constitutionalists", or "Damn Constitutionalists", as though they are some type of low-life who only twist the meaning of said Constitutions to something other than the clear meaning of said documents which really do, AS A MATTER OF FACT, clearly indicated the good-faith "intent," of those original Sovereign American Founding Fathers who created them, and is now constitutionally binding on all governmental officers, agents, and employees.  As can be readily observed, the subject basic land law research study, is the result of many years of historic and legal research that relates primarily to basic land law issues in America.

## HISTORIC BACKGROUND OF THE UNITED STATES LAND PATENTS

23.    Like the original foreign governments, the UNITED STATES (government) used its vast Public Domain Land to encourage settlement in the far north and western frontier with its own Land Grant programs.  The original Land Grant was only the first step.  People and organizations were enticed into the frontier with the promise of free or inexpensive land.  Some men formed corporate organizations that would qualify for huge grants of land for the development of railroads across America. Extremely large Railroad Land Grants were created so the railroad could sell some of the outlying land to help finance the new railroads.    The UNITED STATES (government) even got heavily involved with the construction of a first transcontinental railroad to the Pacific coast.  The eastern portion of the first transcontinental railroad was financed by the UNITED STATES (government) which was also known as the Union.  That portion, therefore was named the Union Pacific Railroad.

24.    Other railroads were also granted every other odd numbered, one mile square, 640 acre Congressional Township Survey - Section, in a checkerboard swath across the country forty miles wide – twenty miles on each side of the proposed railroad right-of-way.

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

25.    The railroad grantees could also qualify for the coveted UNITED STATES LAND PATENT, but ONLY AFTER the tracks, bridges, and stations were up and running and the UNITED STATES (government) could then use the railroad for settlers, its military, and for the UNITED STATES MAIL. The railroads could *only then* apply for the coveted UNITED STATES LAND PATENT.  With the railroads, it sometimes took decades.  Today's maps show those old and still valid early railroad grant land that finally qualified were FOREVER Quitclaim released with the issuance of the related UNITED STATES LAND PATENTs.

26.    Like all other Land Grants, after application, the railroad land had to be surveyed by the UNITED STATES SURVEYOR GENERAL, or his deputy.  The actual survey and other evidence of qualification were presented to the UNITED STATES GENERAL LAND OFFICE (the GLO) for confirmation, and all interested parties were invited to make their appearance.  The confirmation hearings were to FOREVER settle all claims and interests regarding the land in question.

27.    (Note:  The word "settle" is underlined in this document to show the importance of its meaning.  Its power shows up through more than a hundred and fifty years of federal case law and high court determinations)

28.    If a state, county or city, or the UNITED STATES (government) desired some sort of future interest in the subject land it was at the Confirmation Hearings held by the GENERAL LAND OFFICE (GLO) where that interest, if it qualified, was to be expressly incorporated into the UNITED STATES LAND PATENT itself.  The new UNITED STATES LAND PATENT, when finally issued, was thereafter signed by the PRESIDENT OF THE UNITED STATES and filed in the UNITED STATES NATIONAL ARCHIVES.  That was and is how important they were and are to this very day.

29.    Some of those early UNITED STATES LAND PATENTs also made what was known as a Reservation of Rights for subsurface oil, minerals, and water.  Usually the specified water rights were for mining, agriculture and industry.  Usually

13

water for domestic water companies were not mentioned.  Sometimes the UNITED STATES government would also reserve the right to construct future Ditches and Canals by the UNITED STATES ARMY CORP. OF ENGINEERS.  That particular interest would be shown as "D/C" on the actual UNITED STATES LAND PATENT Survey Plat Map kept by the UNITED STATES - GENERAL LAND OFFICE (GLO).

30.    Since 1947 A.D. the UNITED STATES GENERAL LAND OFFICE (GLO) was taken over by the UNITED STATES DEPARTMENT OF THE INTERIOR'S, BUREAU OF LAND MANAGEMENT, or the BLM.  The BUREAU OF LAND MANAGEMENT and the UNITED STATES NATIONAL ARCHIVES spend millions of dollars each year to maintain and preserve the records of the old original still valid UNITED STATES LAND PATENTs because of their FOREVER importance and value today. All California Land Patents are recorded with the CALIFORNIA STATE LAND DEPARTMENT and are also recorded in the CALIFORNIAL STATE ARCHIVES.   Certified copies are available from these governmental agencies at a nominal cost.

31.    No matter how the UNITED STATES LAND PATENT originated, either from an earlier foreign government Land Grant, or from the UNITED STATES government Land Grant, the final Quitclaim transfer recognition and confirmation document was known as a UNITED STATES LAND PATENT.   When THAT document was issued ALL former foreign Land Grants and ALL new UNITED STATES LAND GRANTS became equal in force and effect.   With very few exceptions, the pure Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control of the subject land with the noted Reservation of Rights if any, had to be noted on the actual UNITED STATES LAND PATENT. Such exceptions such as for Ditches and Canals (D/C) or for sub-surface water rights, the land was always "Quitclaim transferred" by the UNITED STATES LAND PATENT to the patentee, his heirs, (or successors with railroad corporations) and assigns *FOREVER*.

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

32.    The subject research study, indicates that the UNITED STATES (government) used its vast UNITED STATES PUBLIC DOMAIN LAND, within the boundaries of the western states, primarily:

a.    To raise money for the UNITED STATES (government),

b.    To encourage settlement of the west, with Homestead Grants,

c.    To encourage railroad building, with Railroad Grants,

d.    To encourage mining, with Mining Claim Grants,

e.    To support the building of the University of California, with School Grants.

f.    To support the building of California agriculture and trade schools, also with School Grants.

g.    To support the building of California elementary public schools, also with School Grants.

h.    To set aside government land for National Forests, National Parks, National Monuments, National Wild Life Refuges, and National Indian Reservations.

33.    The UNITED STATES (government) thus issued many forms of its own Land Grants which also led to a final confirmation and absolute Quitclaim transfer of ALL UNITED STATES governmental Sovereign Allodial Land Ownership Rights, Title, Interest, Estate, Use, and Control to the private sector with the issuance of its UNITED STATES LAND PATENT.

34.    The related research study indicates the UNITED STATES government conveyed its Public Domain Land in at least 26 different ways.  Many of those early Quitclaim transfers were through the UNITED STATES (governments') GENERAL LAND OFFICE, (the GLO) and later through the BUREAU OF LAND MANAGEMENT, (the BLM) through its many different Land Grant programs.

35.    The subject research study also indicates that the only land that was granted to the new 1849 A.D. State of California out of the UNITED STATES PUBLIC DOMAIN LAND, was what was then known as the Public Trust Easement, and today known as California State Sovereign Lands.  Today's CALIFORNIA STATE LAND

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

DEPARTMENT indicates these California State Sovereign Lands to be all navigable rivers and lakes up to their mean (or average) low water marks. These wet-lands became a financial burden to the new 1849 A.D. State of California, as it became its new obligation, duty, and responsibility, keep those waterways clear and open for the pleasure and commercial business of the Sovereign American People of the State of California.

36.    With the entrance of California into the Union of States, on September 9, 1850 A.D. the UNITED STATES (government) granted the new 1849 A.D. State of California, from its "UNITED STATES PUBLIC DOMAIN LAND", located within California, 500,000 acres for the financial support of the new UNIVERSITY OF CALIFORNIA. Shortly thereafter, the UNITED STATES government also granted the new State of California all of its other wet-lands that were not navigable, including all marshes, swamps, bogs, lagoons, estuaries, and sloughs. That is, UNLESS, they were also located within an original Spanish or Mexican Land Grant where it had absolutely no Sovereign, Allodial Land Ownership, Right, Title, Interest, Estate, Use, and Control.

37.    Shortly thereafter the UNITED STATES (government) granted the new State of California another 150,000 acres of its "UNITED STATES PUBLIC DOMAIN LAND", located in California, to financially support the California agriculture, mining, and trade schools.

38.    Then sometime AFTER the UNITED STATES CONGRESSIONAL TOWNSHIP SURVEY was commenced, the UNITED STATES (government) also granted the new State of California, Sections 16 and 36 out of every surveyed 36 square mile Township, specifically for the financial support of the California elementary schools.    These School Grant lands were noted on the UNITED STATES CONGRESSIONAL TOWNSHIP SURVEY Maps as "S/G's" or School Grants.

39.    It is important to note that the UNITED STATES (government) made the "YOSEMITE GRANT" to the new State of California in 1864 A.D. out of its UNITED STATES PUBLIC DOMAIN LANDS and it became California's first State Park. The

16

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

reader might also find it interesting that the State of California did such a poor job of managing the subject "YOSEMITE GRANT," that the UNITED STATES (government) canceled the "YOSEMITE GRANT" 44 years later, in 1908, and made it a UNITED STATES NATIONAL PARK.

40.    What is being demonstrating here is that within the "UNITED STATES PUBLIC DOMAIN LANDS" located within the boundaries of California, the new State of California owned and controlled *absolutely no dry land*, since the UNITED STATES (government) originally granted California only wet-lands.  Absolutely no Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control of any dry land was granted to the new State of California until the above-mentioned School Grants were made when the new State of California was entered into the Union of freely associated compact states on September 9, 1850 A.D. , which became the *ONLY* dry land EVER granted to the new State of California.

41.    Thereafter, when the State of California "sold" the above-mentioned School Grant lands to raise school money, it also, without reservation, *FOREVER* Quitclaim transferred ALL of its state governmental Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control in those School Grant Lands to the private sector, via its own CALIFORNIA LAND PATENT.    Those CALIFORNIA LAND PATENTS are now on file with the CALIFORNIA STATE LANDS DEPARTMENT, and the CALIFORNIA STATE ARCHIVES.

42.    Much Stare Decisis (literally hundreds of decisional case law of the American Courts, state and federal, over a time span of more than one hundred and fifty years and a part of the subject research study) clearly recognizes that if an interest in the subject land was *not* timely made *during* the issuance proceedings of the subject UNITED STATES LAND PATENT, any legal governmental entity that might have any desired future interest was precluded from EVER having such future interest as it was *forever* SETLLED without their interest being noted.    That issue is *only one* of the material issues presented herein.

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

43.    Decisional case law also clearly indicates that *most* (not all) of the early UNITED STATES LAND PATENTs were for pure Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control to the center of the Earth with absolutely no listed sub-surface restrictions or reservations identified.  Since the benefits of the UNITED STATES LAND PATENT was good for the original patentee, his heirs (or successors with railroad corporations) and assigns *FOREVER*, they also became good to anyone in the chain of title from the original patentee and even those mere occupants or inhabitants on the land who were NOT in the chain of title, such as tenants. The reason is simple. At the time the UNITED STATES (government) "Quitclaim transferred" all of its Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control to the private sector FOREVER, the recognized or released land was simply FOREVER off-limits to ALL governmental officers, agents and employees as any and all governmental interest had been Quitclaim transferred FOREVER.

### TODAY'S JURISDICIONAL PROBLEM

44.    The    major    problem    for    the    1912 A.D.  COUNTY  OF  SAN BERNARDINO, and all of its political subdivisions today is that those UNITED STATES LAND PATENTs and STATE OF CALIFORNIA LAND PATENTS, transferred or otherwise released ALL Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control to the subject Big Bear Lake land, in their own words, FOREVER.    Even though there became several Reservation of Rights exceptions listed in later and more recently issued Land Patents, said exceptions were mandated to be specifically mentioned on those later and more recent Land Patents.  If those specific Reservation of Rights were not mentioned thereon, they were *FOREVER* precluded from *EVER* being established in the future.   The question now becomes: "What is it about the word *FOREVER*, that today's governmental officers, agents, and employees do not comprehend?

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

45.    Now comes the hard part for all city, county, and state governments to accept. Because of the above historical facts of law and short of some actual express governmental Administrative-Law contract, ALL private land located within the boundaries of the STATE OF CALIFORNIA appears to be outside the jurisdictional scope of the 1879 A.D. STATE OF CALIFORNIA and its 1912 A.D. COUNTY OF SAN BERNARDINO, and ALL of their political subdivisions, for the following four reasons:

a.    All Spanish and Mexican Rancho's and the Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control granted to their grantee's were "recognized" as outside the scope of even the UNITED STATES (government), BEFORE there were ever any western states. The UNITED STATES (government), therefore, could not grant ANY Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control in land that it did not own.

b.    When the UNITED STATES (government) "Quitclaim transferred" some of its dry Public Domain Land through its Land Grant and Land Patent programs, it "Quitclaim transferred" ALL governmental Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control to such land FOREVER, directly to the private sector. No STATE OF CALIFORNIA or COUNTY OF SAN BERNARDINO involvement is thereon reserved and is thus FOREVER precluded.

c.    When the UNITED STATES (government) granted School Grant Lands to the new State of California, it was for the new state to use or sell for money to finance the different school systems and California was to place the purchase money into a perpetual trust for California schools.

d.    When the new State of California sold its School Grant Lands it then issued its own California Land Patents to the purchasers, thus releasing ALL California governmental Sovereign Allodial Land Ownership, Rights, Title,

19

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

Interest, Estate, Use, and Control to such land FOREVER, and it was directly to the private sector.

46.    In other words, as stated earlier, ALL Allodial title to dry private land was either FORVER "recognized" by the UNITED STATES (government) as Spanish or Mexican Land Grants, OR it was FOREVER directly "Quitclaim transferred" to the private sector by the UNITED STATES LAND PATENT. OR

47.    ALL Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control of the School Grant lands originally held by the UNITED STATES government was FOREVER "Quitclaim transferred" by the State of California, via the issuance of its own CALIFORNIA LAND PATENT program, via the sale of its School Grant land to the private sector.

## HISTORIC CALIFORNIA CASE LAW

48.    It is hereby noted that original 1850's California case law even indicates it was the DISTRICT COURT OF THE UNITED STATES and its UNITED STATES Marshals that dealt with the problems of the old shoot-em-up days of the Gold Rush, and NOT the State of California and its court system. The first California murder cases that originated within the boundaries of the new 1849 A.D. State of California was committed on the state wet-lands then known as the CALIFORNIA PUBLIC TRUST EASEMENT. The State of California had absolutely no regulatory or criminal judicial jurisdiction on the vast UNITED STATES PUBLIC DOMAIN LAND.

49.    A look at the various original city and county Charters, indicates that the only reason for those governments existence was to serve the Sovereign American People of the State of California and its Sovereign inhabitants, by building and maintaining public parks, streets, roads, highways and bridges, and to build and maintain public buildings such as hospitals, public schools, courts, jails, and other public buildings for service to the Sovereign People of the State of California. There is absolutely no evidence that the intent of the original Sovereign law makers was to ever

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

inflict any type of governmental regulatory control over private land, and the non-criminal actions of the Sovereign People of the State of California in which those governmental entities were created to serve.

## CALIFORNIA'S JURISDICTIONAL PROBLEM

50.    Now here is the big problem. Neither the 1912 A.D. COUNTY OF SAN BERNARDINO, nor any of its offices, agencies, employees, or political subdivisions, showed up or claimed any type of Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control jurisdictional interest in the subject Big Bear Lake land during the public Confirmation Hearings which were timely conducted in concert with the application for the subject UNITED STATES LAND PATENT. Thus those California governmental agencies were and are FOREVER precluded from EVER possessing or asserting *ANY* Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control OR any California Legislative, Executive, or Judicial Authority or interest over the subject Big Bear Lake land now or in the future.

51.    On the specific date the subject Big Bear Lake land was granted its UNITED STATES LAND PATENT, the UNITED STATES (government) Quitclaim released ALL of its governmental Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control in the subject Big Bear Lake land *FOREVER*. Said UNITED STATES LAND PATENT was then signed by the PRESISDENT OF THE UNITED STATES OF AMERICA and thereafter recorded in the UNITED STATES NATIONAL ARCHIVES. The reader would be well advised to read Summa Corp. v. California ex rel State Lands Commission & City of Los Angeles 104 US 1754 [April 17, 1984, AND ALSO the related more recent case: The City of Los Angeles v. Venice Peninsula Properties, The State of California Summa Corporation [As Modified on Denial of Rehearing Dec. 21, 1988 A.D., Review Denied March 2, 1989 A.D., 205 Cal.App.3d 1522. These related cases clearly show how the City of Los Angeles and the State of California NEVER HAD ANY Sovereign Allodial Land Ownership,

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

Rights, Title, Interest, Estate, Use, and Control to a large piece of the perceived powerful Coastal Public Trust Easement, to the higher power of an old, original 1850's UNITED STATES LAND PATENT.

## TWO FAIRLY *RECENT* UNITED STATES SUPREME COURT CASES
## SIMILAR TO THE INSTANT CASE

52.    LOS ANGELES v. VENICE PENINSULA PROPERTIES (Cal.App. 2Dist. **1988**) 253 Cal.Rptr. 331, 205 Cal.App.3d 1522.

53.    A 1988 case where John K. Van de Kamp, California Attorney General, and James K. Hahn, City Attorney for the City of Los Angeles, lost to a very old, original Mexican Land Grant that had earlier advanced to the status of a UNITED STATES LAND PATENT, with the admonition: **"This litigation was commenced in 1965. It seams evident that the cost to the taxpayers of this protracted litigation aimed at circumventing the Constitution and which has consumed some 23 years far exceeds the cost for which the property could have been acquired . . . in 1965. . . ."** And

54.    UNITED STATES v. O.DONNELL, (1938) 303, 305, U.S. 501-525;

55.    A 1938 case where the UNITED STATES Assistant Attorney General, Carl McFarland, of Washington D.C. and Acting Solicitor General for the UNITED STATES government lost to a very old, original Mexican Land Grant that also had earlier advanced to the status of a UNITED STATES LAND PATENT. This was a UNITED STATES Government action to quiet title to lands occupied by the Mare Island Navy Yard in San Francisco Bay. The subject land had even been reserved for public purposes by Presidential Proclamation way back in 1850 A.D. and was selected by the Secretary as a navy yard pursuant to Act of Congress and was reserved for that purpose by Presidential Order in 1853 A.D.

56.    The Board of Land Commissioners had been created "to ascertain and settle the Private Land Claims in the State of California, with the attendance of the "agent" of the UNITED STATES (government) who was required to attend in order

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANIFFF Joaquin Andres Acosta**

that he might "superintend the interests of the UNITED STATES (government)." The high court state: **"The final decree of the Board, which now stand undisturbed by any subsequent proceedings in the courts, cannot be disregarded."**

57.    It is clear that ALL federal and state laws reference the historic background of that law somewhere near the end of the law. Why? Because the history of a law is crucial in understanding that law _and the intent of the original lawmaker_ who created it. Historic documents indicate that everything that looks like a law is not necessarily a law. A pretend or invalid law requires no obedience, and there can be no penalty for violating an invalid or unconstitutional law.

58.    Laws are a lot like people. They may be of a higher rank than others. A law with a high rank, is to be obeyed before a conflicting lesser law. Of course, the highest form of law is a Constitution. The state Constitution is the Supreme Law of the state, whereas the CONSTITUTION FOR UNITED STATES OF AMERICA is the Supreme Law of the Land _and the entire country_.

59.    Under the original organic 1849 A.D. Constitution for the State of California laws are known as statutes. They are to start out as bills and only become laws after precise constitutional procedures are followed.

60.    Under the CONSTITUTION FOR THE STATE OF CALIFORNIA, the laws are known as Statutes at Large and Revised Statutes. They also are to start out as bills and only become laws after precise Constitutional procedures are followed.

61.    Article VI, Paragraph 2, of the 1787 A.D. CONSTITUTION FOR THE UNITED STATES OF AMERICA, clearly states: **"This constitution and the laws made pursuant thereto, and all treaties made or which will be made shall be the supreme law of the land."** (The term Law of the Land therein stated has been defined as referring to the Common Law and is opposite to the basic Law of the Sea.) The subject of Land Grants and Land Patents are directly related to UNITED STATES – SUPREME LAW OF THE LAND, "treaties" and is the focus of the subject research study.

### BASIC AMERICAN LAND LAW

62.    The Research Study indicates how it was the UNITED STATES (government) that took control of its Public Domain Land in the different states, and surveyed it to determine its inventory for future development through sale, lease, and grants.    The Research Study also indicates the tremendous amount of time, effort, energy and money spent by the UNITED STATES (government) to survey, chart, and record its Public Domain Land making the required field notes regarding 19 different noteworthy subjects.    The State of California did ABSOLUTELY NONE of this type of work as, the reader will note, except for the School Grants, ALL dry land belonged only to the UNITED STATES (government).

63.    The subject Research Study indicates the 26 different methods the UNITED STATES (government) released its land from its own PUBLIC DOMAIN LAND and either placed it into the hands of private Sovereign People of California or their businesses, or into its own protective National Governmental entities.

64.    In 1851 A.D. the UNITED STATES CONGRESS passed a law to finally "Ascertain and settle the private land claims" in California.    The idea was that it was in the public interest to settle these land claims FOREVER.    When all challenges were timely made and the confirmation was made, and all appeals were exhausted, and the UNITED STATES LAND PATENT was issued, the issue of ownership and control became FOREVER settled.    Society could not have these private land issues opened constantly in the future disrupting the lives of the people who justifiably relied on those Confirmation Hearings, Court Orders, and Appeals.

65.    What the subject Research Study has not as yet discovered, is any reference to any method or time when the 1912 A.D. COUNTY OF SAN BERNARDINO, or any of its political subdivisions obtained any Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control in any private land without first complying with the confirmation hearing process and attempting to timely enter said type of desired interest into the record developed at said hearings.    As shown

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

above, the decisional case law (Stare Decisis) shown indicates that recent high court cases were decided against the governmental entities, their big name attorneys, and their big money, in favor of the still holding historic case law precedence.

66.    This basic land law Research Study also indicates that governmental agencies may trespass on private land, even though it may be protected by a UNITED STATES LAND PATENT, *only for* the search and seizure of criminal evidence and or persons, but *only with* a "criminal" Affidavit of Probable Cause pursuant to a Fourth Amendment Search Warrant, and such Affidavit of Probable Cause had to be signed under Oath or Affirmation, <u>particularly describing the Common-Law Felony crime related person, place, or thing to be searched or seized</u>.  It should be noted that AS WITH THE INSTANT ACTION, Administrative Law, Quasi-criminal actions have NEVER risen to the level of 1789 A.D., Fourth Amendment mens rae or mala in se criminal actions, the only criminal actions in place before Congress met to adopt lesser Quasi-criminal Laws.

67.    To be more precise, *at the time* the 1789 A.D. Fourth Amendment was created and thereafter ratified in 1791 A.D, the term "Probable Cause" could only have refer to a "mala in se" (bad in itself) or mens rae unwritten, common-law felony crime of evil, criminal intent, such as murder, rape, arson, kidnapping, and treason. The term "probable cause" did NOT relate to the more recently created "mala prohibita" (bad because prohibited) Administrative-Law Quasi-crimes, such as mere Code Enforcement private Administrative-Law violations.    Therefore, mere "mens prohibita" Administrative-Law, Quasi-criminal, Code Enforcement "Administrative Inspection Warrant," showing only "Cause," or "Possible Cause," or "Reasonable Cause," or any other type of non-criminal action does not rise to the high level of a 1879 A.D. criminal Fourth Amendment "mala in se" criminal "Probable Cause," and its related "Search Warrant" or "Seizure Warrant," where a "mens rea" (guilty mind with evil intent) criminal unwritten law, Common-Law Felony is suspected.

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

68. For several years, this information has been presented, as a lawful "Presentment" under the Uniform Commercial Code (U.C.C.), to a number of government agencies as well as private entities that could possibly be judicially considered as co-conspirators with those governments. These lawful and timely UCC Presentments have been made in reference to a similar "Jurisdictional Challenge" associated with this related information. As of the date of this document, absolutely no "proof of jurisdiction" has ever been presented. Therefore, THIS UCC Presentment, is an opportunity for someone to be the first to find the missing Constitutional article, section, sub-section, clause, amendment, or constitutional statute or some constitutional decisional case law that will controvert this research.

## OFFERED PROOF THAT JURISDICTION DOES NOT EXIST

69. As of the date of this document, the UNITED STATES BUREAU OF LAND MANAGEMENT (the BLM) records show absolutely no Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control or ANY state legislative, executive, OR JUDICIAL interest in the subject UNITED STATES LAND PATENTED private Big Bear Lake land as having ever been reconveyed through, sale, trade, or gift to the 1879 A.D. STATE OF CALIFORNIA or any of its political subdivisions, such as the 1912 A.D. COUNTY OF SAN BERNARDINO, or ANY of their political subdivisions, agencies, bureaus, boards, departments or services including, but not limited to their far reaching contractual related regulations.

70. For all of the above stated reasons, it is alleged that the subject private Big Bear Lake land is outside the Constitutionally lawful scope of any Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control of the 1879 A.D. STATE OF CALIFORNIA or any of its political subdivisions, such as the 1912 A.D. COUNTY OF SAN BERNARDINO. There simply was no mention of such an interest in the subject Big Bear Lake land during the confirmation hearings of said UNITED STATES LAND PATENT. (Attached) It is herein, therefore alleged, that

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

such California entities are without any Constitutionally lawful In Rem Jurisdiction, Subject Matter Jurisdiction, or Venue Jurisdiction regarding the subject private Big Bear Lake land and, therefore, they have absolutely no Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control of such private land.

71.    It is common knowledge and well-settled black letter Hornbook law that a governmental agency may not grant any powers or interests it does not itself have.  The related Research Study indicates that even the UNITED STATES (government) and its court system recognize that it *NEVER* had any Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control to any of the old, historic, original Russian, French, Spanish, or Mexican Land Grant lands.  Therefore, that governmental entity COULD NOT possibly pass any type of Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control to the 1879 A.D. STATE OF CALIFORNIA or its 1912 A.D. COUNTY OF SAN BERNARDINO, or ANY of their political subdivisions.

## VIOLATION OF THE DOCTRINE OF GOOD FAITH AND FAIR DEALING

72.    Under the Doctrine of Good Faith and Fair Dealing, and Constitutional Due Process Notice, Andy Acosta hereby presents this UCC Presentment Document to provide detailed information, justifiably relied upon, regarding the historic and lawful status of the subject private Big Bear Lake land in relation to any possible interest the 1912 A.D. COUNTY OF SAN BERNARDINO or the CITY OF BIG BEAR LAKE might claim over such UNITED STATES LAND PATENTED private land.

73.    The related research study indicates that all land in the Western UNITED STATES is either under the direct ownership and regulatory control of the UNITED STATES (government), or the State governments with their political subdivisions, OR it is privately owned and completely outside of the taxing and regulatory control of the Federal and State governments.  In other words, it appears that unless there is some sort of actual contract, expressed contract, implied contract, quasi-contract, adhesion contract, or document in the nature of a contract, that would pull the private land

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

located in California into the taxable and regulatory control of some *administrative* governmental agency, except for the original 13 colony/states and Texas, ALL *private land* located in the United States of America, is completely outside the scope of any governmental taxing, regulatory, OR JUDICIAL CONTROL. ALL OF IT.

74.    Like any other corporate entity, it appears that a state or federal governmental agency or political subdivision thereof only have regulatory jurisdiction and control over their own land and buildings.  Therefore, it appears that the 1912 A.D. COUNTY OF SAN BERNARDINO, can only regulate and control its own land and buildings with its Municipal or Development Codes.  These governmental entities are simply federal corporate, "Administrative forms of government" and may only create "Administrative laws" or "Administrative codes" over their own land and buildings such as that of California State University, or any other "corporate administration" can create "administrative laws, rules, and regulations" over its own land and buildings. The related research study indicates, that like California State University, the 1912 A.D. COUNTY OF SAN BERNARDINO, may NOT attempt to enter, regulate, or control the private land use out in the community without committing a Trespass.

## A JURISDICTIONAL CHALLENGE IN GENERAL

75.    Competent Subject Matter Jurisdiction is the *threshold question* regarding all governmental actions.  Well settled High Court decisional law clearly states: "When jurisdiction is challenged, it must be proven."  A mere "Declaration of Jurisdiction," by one claiming it is not the same as "Proof of Jurisdiction," and is Constitutionally unacceptable.  This document thus places a burden on the receiver and his or her governmental agency to offer the proof of taxing, regulatory, or judicial jurisdiction needed to meet this challenge. IT'S THE LAW.

76.    The related Research Study supports Plaintiff Acosta's Challenge to governmental taxing, regulatory, or judicial jurisdiction over the subject Big Bear Lake private land.   Plaintiff Acosta hereby openly supplies this *abundant* material information in which he now justifiably relies, and demands this information be timely

28

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

addressed with controverting information, if any can be found, as "proof" of competent

taxing, regulatory, or judicial jurisdiction over the subject private Big Bear Lake land.

The burden is now on the receiver.

## LAND PATENT HISTORIC BACKGROUND

77.    Unlike 150 years ago, most people today are <u>un</u>aware of the recently

<u>re</u>discovered tremendous power of the FOREVER benefits of the coveted *original*

UNITED STATES LAND PATENTs that were either granted from the UNITED

STATES (government) or perfected and confirmed from the many original, old historic

Russian, French, Spanish, and Mexican Land Grants.  Those UNITED STATES LAND

PATENTs that sprung from those old, historic, Russian, French, Spanish, and Mexican

Land Grants were part of the Land Grant recognition procedures implemented pursuant

to the 1787 A.D. CONSTITUTION FOR THE UNITED STATES OF AMERICA and

international treaty law.

78.    During the time from 1519 A.D. until the Mexican Nationals declared

their independence from Spain in 1821 A.D., the Spanish government granted land

through its own Spanish Land Grant program in the land mass then known as NEW

SPAIN.    Thereafter, from 1821 A.D. to 1848 A.D. the new Mexican government

renamed parts of the former NEW SPAIN as ALTA (or upper) CALIFORNIA.

79.    During that time, Mexico, through international law, "recognized" the 20

old, original massive Spanish Land Grants in the area of ALTA CALIFORNIA in

which all of the Spanish governments' surface rights, title, and interest had been

released to the grantee, *FOREVER*.

80.    The Mexican government then later also granted Land Grants in the area

through its own Land Grant program.  Like the previous Spanish Land Grants, those

Mexican Land Grants were a two-stage procedure.  The grantee would select the land

he desired, mark the identifiable boundaries and after years of specific development and

occupation would qualify for the "surface rights" to the subject land to be *FOREVER*

released to him or her.  With the Mexican Land Grants, this was done after application,

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

proof, and testimony to the Mexican Departmental Assembly. Also like the original Spanish Land Grants, the more than seven hundred (700+) qualified and confirmed Mexican Land Grants stated somewhere in their language, "the surface land rights were released to the grantee, his heirs and assigns *FOREVER*". Both Spanish Land Grants and Mexican Land Grants reserved the subsurface water and mineral rights to the issuing Spanish or Mexican governments. After governmental confirmation, both the Spanish and Mexican Land Grants were known as Perfected Land Grants.

81.    The 1848 A.D. implementation of the Treaty of Guadeloupe Hidalgo officially ended the UNITED STATES War with Mexico and the northern portion of the huge land mass under Mexican control, including California, became known as UNITED STATES PUBLIC DOMAIN LAND. Located within the huge land-mass were those more than seven hundred and twenty (720+) old treaty-recognized, but unidentified, Spanish and Mexican Land Grants.

82.    The subject Research Study indicates that when the State of California was created, the UNITED STATES government, which was already in control of the general land mass, as a Possession, did not convey any rights, title, or interest in any of the dry land within the borders of California to the new state. The new State of California was completely landless.

83.    Later, after the new State of California was accepted into the union of freely associated, compact states, the new State of California was granted out of the UNITED STATES PUBLIC DOMAIN LAND, ALL rights, title, and interest to what was known as the Public Trust Easement, which were all of the navigable river bottoms and lake bottoms up to the mean (or average) high water mark. These specific wet-lands today are known as California's State Sovereign Lands. The original grant of those wet-lands presented a new financial burden to the new State of California and that burden was to keep those wet-lands open for the eternal use of the California's Sovereign People for their own private business and recreation. Later, the UNITED STATES government]also released all rights, title, and interest to the rest of the wet-

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

lands in California, identified as swamps, bogs, lagoons, marshes, estuaries, and sloth's. The UNITED STATES government then continued to keep and maintained ownership, regulatory, and judicial control of ALL the dry land within the borders of the new State of California.

84.    There was one very obvious exception to the above, and that was those old original 720 Spanish and Mexican Land Grant lands. Pursuant to the 1848 A.D. International Treaty of Guadeloupe Hidalgo, even the UNITED STATES government could not obtain ownership, regulatory, or judicial control of the aforementioned Spanish and Mexican Land Grant lands by the act of placing them into the category then known as UNITED STATES PUBLIC DOMAIN LANDS.

85.    Due to the "recognition" language of the Treaty of Guadeloupe Hidalgo and its associated Protocol of Queretaro, the UNITED STATES CONGRESS needed to know the physical location of those 720 Spanish and Mexican Land Grants, so in 1851 A.D., it created the federal law needed to identify those locations. The law was called "The Mexican Claims Act of 1851," entitled: AN ACT TO ASCERTAIN AND SETTLE THE PRIVATE LAND CLAIMS IN CALIFORNIA. It allowed the old Spanish and Mexican Land Grant owners in California two years to apply for the coveted UNITED STATES LAND PATENT with all of its better land ownership rights. The Land Grant owners had to present their original grant papers and bring their evidence and witnesses to the special confirmation hearings before they were actually granted the higher status as evidenced by the coveted UNITED STATES LAND PATENT. It was a higher status because said UNITED STATES LAND PATENTs not only "recognized" the old original Spanish and Mexican Land Grants and their "surface" rights, but also "released" all "subsurface" rights, title, and interest that were not granted by the former Spanish and Mexican governments to the center of the Earth.

86.    The subject Research Study found that the original, 20 old Spanish Land Grants were first granted and then confirmed by the Spanish government. Then when Mexico took control in 1822 A.D. those same confirmed Spanish Land Grants were

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

later again confirmed by the Mexican government.    Then still later those same previously confirmed Spanish and Mexican Land Grants, were also confirmed by the UNITED STATES [government, with judicial appeals possible to the DISTRICT COURT OF THE UNITED STATES, the UNITED STATES SUPREME COURT, and in some cases to the UNITED STATES CONGRESS, before the issuance of the coveted UNITED STATES LAND PATENT.  This provided those Spanish Land Grant owners three different confirmations by three different international governments.

87.    Like the Spanish and Mexican governments, the UNITED STATES government also granted or sold its vast PUBLIC DOMAIN LAND to raise money as revenue for the UNITED STATES government and to pay for military service.  The UNITED STATES government had not yet learned how to create money from thin air and had to develop it from selling its vast holdings of PUBLIC DOMAIN LANDS.  In doing so it released ALL of its Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control of its PUBLIC DOMAIN LANDS *FOREVER* to which, in some cases, it later wanted back under its control, but it was too late.  Like the Spanish and Mexican Land Grants, the original early UNITED STATES LAND PATENTs also declared release of all of its Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control in the subject Big Bear Lake land *FOREVER*.

88.    That UNITED STATES PUBLIC DOMAIN LAND that was thereafter granted to the states as School Grants, was thereafter released *FOREVER* by the several states through their own Land Grant programs.

89.    Regarding the UNITED STATES PUBLIC DOMAIN LAND, after the early American Entryman qualified, pursuant to the many different UNITED STATES Land Grant programs, they also could apply for the coveted UNITED STATES LAND PATENT.  Some of the later UNITED STATES LAND PATENTs reserved water rights and/or mineral rights or a percentage of those rights, and some reserved to the General (federal) Government the right to install future ditches and canals.  Most did

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

not make any reservations at all and were a complete release and transfer of true and pure Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control to the center of the Earth.

90.    The subject Research Study found that as the UNITED STATES government added additional land to its PUBLIC DOMAIN LAND, first through the NORTHWEST ORDINANCE, then with the LOUISIANA PURCHASE, then with the TREATY OF GUADELOUPE HIDALGO, the GADSDEN PURCHASE, the ALASKA PURCHASE, and so on, it eventually possessed more raw land than all of the original 13 states combined.

91.    As mentioned earlier, and as a clarification, history indicates that Spain issued approximately 20 enormous Spanish Land Grants that survived through the years to finally qualify for the coveted UNITED STATES LAND PATENT.  Then Mexico issued more than 700 Mexican Land Grants that survived through the years to finally qualify for the coveted UNITED STATES LAND PATENT.   Then the UNITED STATES government itself issued literally millions of its own Land Grants that finally qualified for the coveted UNITED STATES LAND PATENT.  The State of California even issued its own Land Patents when it sold the Land Granted to it by the UNITED STATES[government as part of the several different UNITED STATES School Land Grant programs.  In other words, it appears that ALL privately owned land located East of the Mississippi River, was either *FOREVER* "recognized" as a former French, Spanish, or Mexican Land Grant, or it was *FOREVER* "Quitclaim released" by either the federal or state government Land Grant programs.  Whether the private land was *FOREVER* "recognized" or *FOREVER* "Quitclaim released" it was accomplished by either a UNITED STATES LAND PATENT or a STATE LAND PATENT.

92.    Like the original foreign governments, the UNITED STATES government used its PUBLIC DOMAIN LAND to encourage settlement in the far north and west with its own Land Grant programs.  The Land Grant was the first step.  People and Railroad Corporations were enticed into the frontier by the promise of free or

33

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

inexpensive land. Some men formed Corporations that would qualify for huge grants of land for the development of cross-country railroads. Extremely large Railroad Land Grants were created so the railroad could sell some of the outlying land to help finance the new railroads. The UNITED STATES government even got heavily involved with the construction of a first transcontinental railroad to the Pacific coast. The eastern portion of the first transcontinental railroad to the Pacific Coast was financed by the UNITED STATES government which was also known as THE UNION. That portion, therefore was named the UNION PACIFIC RAILROAD.

93.    Later, other railroads were also granted every other odd numbered, one mile square, 640 acre Congressional Township Survey Section, in a checkerboard swath across the country forty miles wide – twenty miles on each side of the proposed railroad right-of-way.

94.    The railroad grantees could also qualify for the coveted UNITED STATES LAND PATENT. After the tracks, bridges, and stations were up and running and the UNITED STATES government could use the railroad for moving its military, the United States Mail, and settlers, the railroads could only then apply for the coveted UNITED STATES LAND PATENT. With the railroads, it sometimes took decades. Today's maps show the checkerboard of those old and still valid early railroad grants that finally qualified and were *FOREVER* released as UNITED STATES LAND PATENTs.

95.    Like all other Land Grants, after application, the railroad land had to be surveyed by the UNITED STATES government Surveyor General or his deputy. The survey and evidence of qualification was presented to the UNITED STATES General Land Office (GLO) for confirmation and all interested parties would make their appearance. The confirmation hearings were to *FOREVER* settle all claims and interests in the land in question.

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

96.    (Note:  The word "_settle_" is emphasized to show the importance of its meaning.  Its power shows up through more than a hundred and fifty years of case law and court determinations.)

97.    If a State or the UNITED STATES government desired some sort of _future interest_ in the subject land it was incorporated into the actual wording of the STATE LAND PATENT or UNITED STATES LAND PATENT itself.  The UNITED STATES LAND PATENTs when issued were signed by the PRESIDENT OF THE UNITED STATES and FOREVER Filed in the UNITED STATES NATIONAL ARCHIVES.  The STATE LAND PATENTS, were signed by the governors of each state and FOREVER Filed with the Secretary of State in the State Archives. That was and is how important they were and are to this day.

98.    Some of the later issued UNITED STATES LAND PATENTs also made a Reservation of Rights for subsurface oil, mineral, and water rights.  Usually the specified water rights were for mining, agriculture, and industry.  Reservation of water for domestic use was not mentioned.  Sometimes the UNITED STATES government would also reserve the right to construct future ditches and canals.  That particular interest would show up as "D/C" on the actual UNITED STATES LAND PATENT Survey Plat Map made by the UNITED STATES SURVEYOR GENERAL and later Filed in the UNITED STATES GENERAL LAND OFFICE (GLO) and later in the NATIONAL ARCHIVES.

99.    Since 1947 A.D. the UNITED STATES GENERAL LAND OFFICE (the GLO) has been known as the UNITED STATES DEPARTMENT OF THE INTERIOR'S, BUREAU OF LAND MANAGEMENT (the BLM.) The BUREAU OF LAND MANAGEMENT and the UNITED STATES NATIONAL ARCHIVES currently spend millions of dollars each year to maintain and preserve the records of the old original UNITED STATES LAND PATENTs because of their current importance today.

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

100.   All UNITED STATES LAND PATENTs are now on File with the UNITED STATES DEPARTMENT OF THE INTERIOR'S, BUREAU OF LAND MANAGEMENT, (the BLM) and the UNITED STATES NATIONAL ARCHIVES. All STATE LAND PATENTS are recorded with the STATE LAND DEPARTMENT and are also in the STATE ARCHIVES. Certified copies are available from these governmental agencies at a nominal cost.

101.   The subject Research Study clearly indicates that no matter how the UNITED STATES LAND PATENT originated, either from an earlier foreign government Land Grant, or from the UNITED STATES government Land Grant, the final title ownership document was a UNITED STATES LAND PATENT. When that document was issued ALL Land Grants became equal in force and effect. With very few exceptions to a pure release, as were noted on the actual UNITED STATES LAND PATENT, such as for Ditches and Canals (D/C) or for subsurface water rights, the land was always "released" by the UNITED STATES government]to the patentee, his heirs, (or successors for Railroad Grants) and their assigns *FOREVER.*

102.   Stare Decisis (decisional case law of the courts) clearly recognize that if an interest in the subject land was not timely made during the General Land Offices' Confirmation Hearings, any entity that may desire such interest in the future, such as a local State, County, or City, it was precluded from EVER having such future interest, unless it purchased that land.

103.   There are literally hundreds of case law precedence that were ruled upon over more than one hundred and fifty years regarding the adjudication of UNITED STATES LAND PATENTs. They clearly indicate if an entity failed, refused, or neglected to make their actual or perceived interest known during those General Land Offices' Confirmation Hearings, it was too late and they could NEVER have the interest desired for all of those issues had been *FOREVER* <u>SETTLED</u> without their interest being noted.

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

104.   Decisional case law also clearly indicates that *most* (not all) of the early UNITED STATES LAND PATENTs were for pure ownership to the center of the Earth with absolutely no listed surface or subsurface restrictions identified.  Since the benefits of the UNITED STATES LAND PATENT was good for the original patentee, his heirs, (or successors for Railroads) and their assigns *FOREVER*, they also became good to anyone in the chain of title from the original patentee and even those who simply occupied or inhabited the land who were not in the chain of title, such as tenants.   The reason is simple.   At the time the UNITED STATES government "released" all of its Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use, and Control FOREVER, the recognized or released land was simply off-limits to ALL governmental officers, agents, and employees FOREVER as that *governmental interest* may relate to anybody on that particularly released and transferred land.

105.   The subject Research Study indicates that there appears to be only one method to defeat a valid UNITED STATES LAND PATENT and that method is through the process of Eminent Domain by the UNITED STATES[government ONLY, for Power Dams and related Reservoirs.  Because neither the COUNTY OF SAN BERNARDINO, nor any of their offices or political subdivisions made any possible future interest known during the GENERAL LAND OFFICES' CONFIRMATION HEARINGS, it appears that no state court, office, agency, or political subdivision may be involved in such a process now at this late date.

106.   If a California State Court attempts such a procedure, it appears that the procedure to use to defeat such an action is to Remove the case to the UNITED STATES DISTRICT COURT system where they know and understand the word *FOREVER* and the *FOREVER* "release-power" of the UNITED STATES LAND PATENT. This is possible due to the fact that the 1787 A.D. CONSTITUTION FOR THE UNITED STATES OF AMERICA, the laws made pursuant thereto, and all treaties, are considered as the SUPREME LAW OF THE LAND ("Law of the Land" meaning the Common-Law and in distinction to the Law of the Sea) and, therefore,

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

within the jurisdiction of those UNITED STATES - Seventh Amendment Common Law Constitutional Article III, Courts of Record.

107.    According to today's UNITED STATES DEPARTMENT OF THE INTERIOR'S, BUREAU OF LAND MANAGEMENT, (the BLM), it would take a UNITED STATES DISTRICT COURT JUDGE to issue such Eminent Domain proceedings, but they say such judge clearly would NOT be quick to do such a thing. They say a UNITED STATES DISTRICT COURT JUDGE certainly would not do such a thing against a single patentee and would only do it for a large land mass only if "a large segment of society would benefit" from such proceeding, such as for a lake and related power dam, a UNITED STATES AIR FORCE BASE.  That process, of course, would also be appealable, if necessary, up to the UNITED STATES SUPREME COURT, and to the UNITED STATES CONGRESS, as the court of last resort, where both have, for many years, understood the power of a <u>settled</u> UNITED STATES LAND PATENT.

### BASIC LAND LAW QUESTIONS and DEMAND FOR ANSWERS

108.    After considering the related Research Study mentioned above, and associated herewith, Plaintiff Acosta hereby asks the good-faith and material constitutional and basic land law questions:

a.    At what precise date in history, and by what legislative act, state or federal, <u>with</u> its required Implementing regulation and Enabling Clause, did the subject Big Bear Lake land come under the taxing, regulatory, or judicial jurisdiction and control of the 1812 A.D. COUNTY <u>OF</u> SAN BERNARDINO or the CITY OF BIG BEAR?

b.    Identify the California Constitutional Article, Section, Sub-section, Clause, or Amendment OR the Constitutionally authorized California Statute, and its official implementation date, that authorizes to establishment of your official position and provides official standing to tax and regulate private land that was "recognized" and "released" FOREVER by the UNITED STATES

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

government]via UNITED STATES LAND PATENT, along with its official Enabling Clause.

109.   These precise dates and exact legislative Acts are sought in good-faith. Plaintiff Acosta hereby demands a good-faith answer to the above good-faith and material questions within a reasonable twenty (20) days of this presentment, as time is of the essence.

110.   Any statements or claims in this document that are properly rebutted by facts of law, or overriding Article III UNITED STATES supreme Court rulings, shall not prejudice the lawful validity of the other claims not properly rebutted or invalidated by facts of law.

111.   Plaintiff Acosta also hereby respectfully DEMANDS a Certified Copy of any and all contract documents that the opposition Claims HE has knowingly, willingly, voluntarily, intentionally, and freely entered into with the 1912 A.D. COUNTY OF SAN BERNARDINO, or the CITY OF BIG BEAR LAKE that would provide competent constitutional - Judicial Department - Court of Record, Court of Common-Law Jurisdiction OR any Administrative-Law Jurisdiction to your office regarding the subject private Big Bear Lake land.

112.   Plaintiff Acosta sincerely believes that he has a "Federal Question" of great public interest that will qualify these issues to be presented to, and heard by, the SUPREME COURT OF THE UNITED STATES OF AMERICA, if necessary.

## FIRST CAUSE OF ACTION

## ARTICLE VI, PARAGRAPH 2 - SUPREMACY CLAUSE VIOLATIONS

**113.**   As to all of the above-named Defendants, Plaintiff Acosta repeats, reiterates, and re-alleges by reference, each and every allegation contained in the paragraphs of this ACTION-AT-LAW designated "1" through "112," inclusive, with the same force and effect as though each are fully set forth in full hereat.

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

114. Plaintiff Acosta had and has the right to justifiably rely on United States Supreme Court United States Land Patent quitclaim case: Beard v. Federy (1866) 70 U.S. (3 Wall.) 478, 18 L.Ed. 88; Teschemacher v. Thompson (1861) 18 Cal. 11, to wit:

**"The nature and effect of the [land] patent issued pursuant to the act of 1851 has been well described by both the United States and Supreme Courts. The [land] patent of the government is [court admissible] <u>evidence of title</u> and is <u>conclusive against the government</u> and all persons claiming under it. The [land] <u>patent is a deed of the United States and operates as a quit claim of any interest the United States may have reserved in the land.</u> It establishes in the grantee <u>full and complete title to the property.</u>"**

115. The phrase "any interest," above clearly means its well-settled Sovereign Allodial Land Ownership Rights, Title, Interest, Estate, Use, or Control interest, obtained through the 1848 A.D. International Treaty of Guadalupa Hidalgo and its Protocol of Queretaro, along with the related Act of May 3, 1851 entitled: "AN ACT TO ASCERTAIN AND SETTLE THE PRIVATE LAND CLAIMS IN CALIFORNIA."

116. Plaintiff Acosta also had and has the right to justifiably rely on the fact that ALL of the named human defendants have sworn or affirmed and then subscribed to their constitutionally mandated OATH OF OFFICE and its related oath to Article VI, paragraph 2, known as the SUPREMACY CLAUSE and how it relates to the above-mentioned International Treaty and the related United States laws and how they relate to the lesser San Bernardino County Codes.

117. ALL named defendants knew or reasonably should have known that they had and have an obligation duty and responsibility to honor, respect and comply with those rights claimed by Plaintiff Acosta as mentioned above.

118. It is hereby claimed that it is and was the violation and trespass on those above-named rights that are the proximate cause of the injuries inflicted on and sustained by Plaintiff Acosta and his business over the years that are directly related to this Cause of Action.

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

**119.** It is hereby claimed that it is a result of Defendants failure of their obligation, duty and responsibility to honor and preserve Plaintiff Acosta's Constitutionally guaranteed and secured Right to FIFTH AMENDMENT DUE PROCESS OF LAW, that Plaintiff Acosta has been injured in the amount of $100,000.00 as his Constitutionally guaranteed and secured Right to FIFTH AMENDMENT DUE PROCESS OF LAW is very valuable to him and have rendered a situation that is adverse to and has placed a cloud upon Plaintiff Acosta's **well-settled** Sovereign Allodial Land Ownership Rights, Title, Interest, Estate, Use, or Control title on his private land and well-established business with their unlawful and unconstitutional procedures.

**120.** It is hereby claimed that it is a result of Defendants failure of their obligation, duty and responsibility to honor and preserve Plaintiff Acosta's Constitutionally guaranteed and secured Right to his Fourth Amendment, Expectation of Privacy that Plaintiff Acosta has been injured in the amount of $2,000,000.00 as his Constitutionally guaranteed and secured Right mentioned herein is very valuable to him and have rendered a situation that is adverse to and has placed a cloud upon his well-settled Sovereign Allodial Land Ownership Rights, Title, Interest, Estate, Use, and Control of his private land and well-established business.

121. Plaintiff Acosta in no way instigated, caused or contributed to the complained of conduct.

122. Plaintiff Acosta states that the allegations of this Cause of Action are stated on his own personal experience, information, and belief with more evidentiary support likely after a reasonable opportunity for further investigation and Discovery.

**SECOND CAUSE OF ACTION**
**FOURTH AMENDMENT RIGHT TO THE EXPECTATION OF PRIVACY AND TO BE SECURE IN THEIR HOUSES, PAPERS AND EFFECTS UNLESS THERE IS AN AFFIDAVIT OF PROBABLE CAUSE OF A 1789 A.D. UNWRITTEN COMMON-LAW FELONY AS CONGRESS HAD NOT MET IN**

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

## CONGRESS ASSEMBLED FOR ANOTHER TEN YEARS TO PASS WRITTEN LAWS

**123.** As to all of the above-named Defendants, Plaintiff Acosta repeats, reiterates, and re-alleges by reference, each and every allegation contained in the paragraphs of this ACTION-AT-LAW designated "1" through "122" inclusive, with the same force and effect as though each are fully set forth in full hereat.

**124.** Plaintiff Acosta had and has the right to justifiably rely on the Fourth Amendment to the 1787 A.D. Constitution for the United States oh America, to wit:

> "The <u>right</u> of the [Sovereign] **people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, <u>shall not</u> be violated, and <u>no Warrants</u> (repeat – NO WARRANTS) shall issue, but upon <u>probable cause,</u>** *(a Common-Law Felony exclusively in 1789 A.D, as AT THE TIME OF PASSAGE, Congress had not yet met to pass or adopt any mens prohibita lesser laws)* **supported by Oath or affirmation, and <u>particularly describing the place to be searched, and the persons or things to be seized.</u>**" (Emphasis added)

**125.** Plaintiff Acosta also had and has the right to justifiably rely on the above-cited Fourth Amendment in which ALL of the named human defendants have sworn or affirmed and then subscribed to their constitutionally mandated OATH OF OFFICE.

**126.** ALL named defendants knew or reasonably should have known that they had and have an obligation duty and responsibility to honor, respect and comply with that right claimed by Plaintiff Acosta as mentioned above.

**127.** It is hereby claimed that it is and was the violation and trespass on that above-named right that are the proximate cause of the injuries inflicted on and sustained by Plaintiff Acosta and his business over the years that are directly related to this Cause of Action.

**128.** It is hereby claimed that it is a result of Defendants failure of their obligation, duty and responsibility to honor and preserve Plaintiff Acosta's Constitutionally guaranteed and secured Right to his Fourth Amendment, Expectation of Privacy that

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

Plaintiff Acosta has been injured in the amount of $2,000,000.00 as his Constitutionally guaranteed and secured Right mentioned herein is very valuable to him and have rendered a situation that is adverse to and has placed a cloud upon his well-settled Sovereign Allodial Land Ownership Rights, Title, Interest, Estate, Use, and Control of his private land and well-established business.

129.   Plaintiff Acosta in no way instigated, caused or contributed to the complained of conduct.

130.   Plaintiff Acosta states that the allegations of this Cause of Action are stated on his own personal experience, information, and belief with more evidentiary support likely after a reasonable opportunity for further investigation and Discovery.

## THIRD CAUSE OF ACTION
### VIOLATION OF THE COUNTY'S OWN
### GRANDFATERED NON-CONFORMING USE LAW

131.   As to all of the above-named Defendants, Plaintiff Acosta repeats, reiterates, and re-alleges by reference, each and every allegation contained in the paragraphs of this ACTION-AT-LAW designated "1" through "130" inclusive, with the same force and effect as though each are fully set forth in full hereat.

132.   Plaintiff Acosta has been in the same Recycling, Heavy Equipment, Tree Service, and Firewood Supply businesses the same town since 1980 A.D., long before the subject unlawfully exercised County Development Codes were implemented. Plaintiff Acosta of us had a right continue in the same recycling entry service business without being attacked by the ex post facto implementation the San Bernardino County Development Code.

133.   All named defendants had an obligation, duty, and responsibility, to honor, respect, such right, and allow his continued and uninterrupted operation of his recycling business according to their own grandfathered nonconforming use law.

134.   As a result of their trespass on the above-mentioned right, Plaintiff Acosta, his business and family has been severely injured as can be proven at trial.

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

**135.**    It is hereby claimed that it is a result of Defendants failure of their obligation, duty and responsibility to honor and preserve Plaintiff Acosta's Constitutionally guaranteed and secured Right to his Fourth Amendment, Expectation of Privacy that Plaintiff Acosta has been injured in the amount of $2,000,000.00 as his Constitutionally guaranteed and secured Right mentioned herein is very valuable to him and have rendered a situation that is adverse to and has placed a cloud upon his well-settled Sovereign Allodial Land Ownership Rights, Title, Interest, Estate, Use, and Control of his private land and well-established business.

136.    Plaintiff Acosta in no way instigated, caused or contributed to the complained of conduct.

137.    Plaintiff Acosta states that the allegations of this Cause of Action are stated on his own personal experience, information, and belief with more evidentiary support likely after a reasonable opportunity for further investigation and Discovery.

## FOURTH CAUSE OF ACTION

### SELECTIVE ENFORCMENT VIOLATION

**138.**    As to all of the above-named Defendants, Plaintiff Acosta repeats, reiterates, and re-alleges by reference, each and every allegation contained in the paragraphs of this ACTION-AT-LAW designated "1" through "137," inclusive, with the same force and effect as though each are fully set forth in full hereat.

**139.**    Plaintiff Acosta had a Right to not be selected out of the fifteen (15) or so other Recycling, Heavy Equipment, Tree Service, and Firewood Supply businesses for prosecution. It can be proven that absolutely no Big Bear Lake competitor involved in the same local work and business has been required to obtain any permits to continue in business as has Plaintiff Acosta by the named Defendants. NONE.

**140.**    All named defendants had an obligation, duty and responsibility, to honor and respect such Right to not be selected out of the seven or so other Recycling, Heavy Equipment, Tree Service, and Firewood Supply businesses for prosecution.

44

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

**141.**    As a result of their trespass on the above-mentioned right, Plaintiff Acosta, his business and family has been severely injured as can be proven at trial.

**142.**    It is hereby claimed that it is a result of Defendants failure of their obligation, duty and responsibility to honor and preserve Plaintiff Acosta's Constitutionally guaranteed and secured Right to his Fourth Amendment, Expectation of Privacy that Plaintiff Acosta has been injured in the amount of $2,000,000.00 as his Constitutionally guaranteed and secured Right mentioned herein is very valuable to him and have rendered a situation that is adverse to and has placed a cloud upon his well-settled Sovereign Allodial Land Ownership Rights, Title, Interest, Estate, Use, and Control of his private land and well-established business.

143.    Plaintiff Acosta in no way instigated, caused or contributed to the complained of conduct.

144.    Plaintiff Acosta states that the allegations of this Cause of Action are stated on his own personal experience, information, and belief with more evidentiary support likely after a reasonable opportunity for further investigation and Discovery.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE OATH OF OFFICE MANDATES OF**
**ARTICLE XX, SECTION 2 OF THE CONSTITUTION**
**FOR THE 1879 A.D. STATE OF CALIFORNIA**

**145.**    As to all of the above-named Defendants, Plaintiff Acosta repeats, reiterates, and re-alleges by reference, each and every allegation contained in the paragraphs of this ACTION-AT-LAW designated "1" through "144," inclusive, with the same force and effect as though each are fully set forth in full hereat.

**146.**    Plaintiff Acosta had a Right to not be attacked by "Street People," who have not "qualified," (pursuant to the mandates of Article XX, Section 2, paragraph 4, of the 1879 A.D. CONSTITUTION FOR THE STATE OF CALIFORNIA) to be an officer, agent, or employee of the 1879 A.D. STATE OF CALIFORNIA, or the 1912 A.D COUNTY OF SAN BERNARDINO unless and until they have "qualified," (Key word)

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLAINTIFF Joaquin Andres Acosta

for their governmental position by constitutionally swearing or affirming and then subscribing (signing) such constitutionally mandated OATH OF OFFICE.

**147.** All named defendants had an obligation, duty and responsibility, constitutionally swear or affirm and then subscribe (sign) the constitutionally mandated OATH OF OFFICE as prescribed at Article XX, Section 2 of the 1879 A.D. CONSTITUTION FOR THE STATE OF CALIFORNIA.

148. It is clearly shown on the attached OATH OF OFFICES on file with the Administrative Department of the SAN BERNARDINO JUSTICE CENTER, eleventh floor, that the OATH OF OFFICE of Defendant TARA REILLY was administered by her husband DAVID COHN, which is herein alleged to be a conflict of interest. It should also be noted that the signature of Defendant DAVID COHN on Defendant TARA REILLY'S OATH OF OFFICE is completely and totally an easily recognized forgery as can be shown to the upcoming TRIAL BY JURY, by Plaintiff Acosta's Expert Handwriting Witness – which is hereby alleged to be just another criminal act by the named defendants.

**149.** As a result of the failure of all named Defendants to constitutionally swear or affirm and then subscribe (sign) the constitutionally mandated OATH OF OFFICE as prescribed at Article XX, Section 2 of the 1879 A.D. CONSTITUTION FOR THE STATE OF CALIFORNIA, Plaintiff Acosta, his business and family has been severely injured as can be proven at trial.

**150.** It is hereby claimed that it is a result of Defendants failure of their obligation, duty and responsibility to constitutionally swear or affirm and then subscribe (sign) the constitutionally mandated OATH OF OFFICE as prescribed at Article XX, Section 2 of the 1879 A.D. CONSTITUTION FOR THE STATE OF CALIFORNIA, Plaintiff Acosta has been injured in the amount of $2,000,000.00 as his Constitutionally guaranteed and secured Right mentioned herein is very valuable to him and have rendered a situation that is adverse to and has placed a cloud upon his well-settled

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

Sovereign Allodial Land Ownership Rights, Title, Interest, Estate, Use, and Control of his private land and well-established business.

151.    Plaintiff Acosta in no way instigated, caused or contributed to the complained of conduct.

152.    Plaintiff Acosta states that the allegations of this Cause of Action are stated on his own personal experience, information, and belief with more evidentiary support likely after a reasonable opportunity for further investigation and Discovery.

## SIXTH CAUSE OF ACTION
## THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT OF 1970, 18 USC 1961 et Seq. RICO VIOLATIONS
## 18 U.S.C. 1962 (a), 18 U.S.C. 1962(c), and 18 U.S.C. 1964 (c),

153.    As to all of the above-named Defendants, Plaintiff Acosta repeats, reiterates, and re-alleges by reference, each and every allegation contained in the paragraphs of this ACTION-AT-LAW designated "1" through "151," inclusive, with the same force and effect as though each are fully set forth in full hereat.

154.    Plaintiff Acosta had a Right to not suffer CIVIL RICO violations regarding his Recycling, Heavy Equipment, Tree Service, and Firewood Supply businesses located in Big Bear Lake since 1980 A.D.

a.    Plaintiff Acosta has court admissible evidence that will clearly prove that he, his family and businesses have all been injured by overt actions which were a foreseeable natural consequences sufficient for proximate causation or facilitative role in the generation of the identified injuries, that were in direct violation of 18 U.S.C. 1962, 18 U.S.C. 1962(c), and 18 U.S.C. 1964 (c), and thus represent the proximate cause of a direct or indirect and requisite casual connection and casual nexus and scheme using deliberate sham pleadings and fabricated evidence of the predicate racketeering acts as noted in Plaintiff Acosta's attached fact pattern document entitled: **PLAINTIFF ACOSTA'S VERIFIED AFFIDAVIT OF CRONOLOGICAL EVENTS THAT DOCUMENT THE DEPREVATION AND TRESPASS OF HIS**

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

**UNALIENABLE RIGHTS AS GUARANTEED AND SECURED BY THE 1787 A.D. CONSTITUTION FOR THE UNITED STATES OF AMERICA.**

b. Plaintiff Acosta has court admissible evidence which can be enhanced by court DISCOVERY that will explore the motives and clearly prove that he, his family, and businesses have all been severely and unconscionably injured by substantial and foreseeable particular actions that were and are all related to constitute a pattern of racketeering activity, for the essence of the violation is the commission of those acts in connection with the conduct of a conspiratorial enterprise, not merely incidental to, but directly caused CIVIL RICO violations by and between all named defendants. Such injuries were anticipated as a natural consequence by all of the named defendants. Due to worldwide web Internet activities these CIVIL RICO violations have also affected interstate commerce.

c. All named defendants used the wires and mails to directly cause and fraudulently induce Plaintiff Acosta by misrepresentations and related falsehood reliance into his costly and time-consuming previous attempts to comply with the named defendants various Administrative-Law ordinances, codes, titles, manuals, resolutions, rules, and regulations, that did not and do not apply to his recently discovered UNITED STATES LAND PATENT protected private land, which were a result of the many colluded and manufactured misrepresentations which relate to a direct connection between the ultimate cause-in-fact, with a legal or proximate cause of plaintiff's major injuries in the form of a loss of money, the loss of his first family, and the loss of his well-established high-standing in the community. The named defendants conduct has been so significant and important that they should be held responsible regarding social policy decisions based on shared principles of justice with punitive CIVIL RICO treble damages.

155. It is hereby claimed that it is a result of Defendants failure of their obligation, duty and responsibility to honor and preserve Plaintiff Acosta's Constitutionally guaranteed and secured Right to his Fourth Amendment, Expectation of Privacy that

48

Plaintiff Acosta has been injured in the amount of $6,000,000.00 as his Constitutionally guaranteed and secured Right mentioned herein is very valuable to him and have rendered a situation that is adverse to and has placed a cloud upon his well-settled Sovereign Allodial Land Ownership Rights, Title, Interest, Estate, Use, and Control of his private land and well-established business.

156.    Plaintiff Acosta in no way instigated, caused or contributed to the complained of conduct.

157.    Plaintiff Acosta states that the allegations of this Cause of Action are stated on his own personal experience, information, and belief with more evidentiary support likely after a reasonable opportunity for further investigation and Discovery.

158.    A dispute has arisen between and among Plaintiff Acosta and the named Defendants and each of them as to the obligations, duties and responsibilities of the respective parties with regard to the well-settled Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use and Control of the subject private land.

159.    Plaintiff is informed that in committing the certain acts and activities herein alleged, some or all of the Named or unknown private Defendants herein were their actions as the Agents, Joint Ventures, Partners, Representatives, Subsidiaries, Affiliates, Associates, Assigns and/or Employees and/or Agents of some or all of the other private Defendants, and that some or all of the conduct of such private and not public Defendants, as complained of herein, were within the course and scope and agency of such relationship.

160.    The subject private land as fully and legally described herein, and the essence of the instant Action is the private land indisputably owned of record by Plaintiff Acosta, as evidenced by a certain Grant Deed.  As to any and all well-settled Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use and Control of the subject private land.

161.    Defendants each unambiguously claim some type of regulatory ownership and related control of Plaintiff Acosta's private land. Defendants have absolutely **NO**

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

**standing NOR can they produce** ANY Legal, Court Admissible Evidence to have any type of ownership or Sovereign Allodial Land Ownership Rights, Title, Interest, Estate, Use, or Control as does Plaintiff Acosta.

> **"A party lacks standing to invoke the jurisdiction of a court unless he has, in an individual or a representative capacity, some real interest in the subject matter of an action."** (Citation omitted)

162.    Defendants have attempted to induce Plaintiff Acosta with fraudulent documents and with NO LAWFUL STANDING in order entice him to waive his now claimed Sovereign Allodial Land Ownership, Rights, Title, Interest, Estate, Use and Control and to appear and answer to Fraudulent Court actions. All lawyer acts and activities appear to be an attempt to induce the state and federal courts to Fraudulently make Judgments, Orders, and Rulings regarding the subject private land and thereby become an Accomplice to their criminal activities.

163.    Accordingly, Plaintiff Acosta respectfully request that this Honorable Court Trial BY Jury to Rule in Favor of Plaintiff ADVERSARY PROCEEDING in its Entirety.

164.    All of the named Defendants' contentions on their Claims of Ownership regulation and control are utterly specious, frivolous and without ANY merit and their entire Claims, are frivolous and designed solely to steal Plaintiff Acasta's private land and related business.

165.    Due to the above-mentioned lack and want of constitutionally lawful standing, Plaintiff Acosta respectfully requests this Honorable court to issue a QUIET TITLE against ALL named defendants and in favor of Joaquin Andres Acosta.

**166.**    One of two truths is evident: Either the subject private land is FOREVER protected by its UNITED STATES LAND PATENT against any state Legislative, Executive, OR JUDICIAL Branches or Departments, along with its Political Subdivision, Counties and Cities, OR IT IS NOT. As of this late date, there is absolutely no Court Admissible Evidence in the instant record of any Sovereign

VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

Allodial Rights, title, Interests, Estate, Use or Control being Reserved on the Actual Quitclaim Transfer UNITED STATES LAND PATENT what so ever, and Plaintiff Acosta sincerely believes that no such Reservation of Rights exists.

**167.** Defendants has shown a complete lack and want of good faith, and have committed constructive fraud, and their obvious disdain for the very OATH OF OFFICE mandates that govern their behavior.

**168.** Plaintiff Acosta has been grossly injured by ALL named Defendants who have never had any type of Constitutionally valid Subject Matter Jurisdiction over the subject private land that is still FOREVER protected by the verbiage of its own UNITED STATES LAND PATENT. (See Attached)

## CONCLUSION

**169.** WHEREFORE, in the interest of justice, Plaintiff Acosta respectfully requests this Honorable Seventh Amendment Trial BY Jury Court of Record to uphold state and federal law along with well-settled American Law and Jurisprudence as held by the United States Supreme Court in its entirety, and to apply such authority to the specific facts which have been established herein, and render an Order to QUIET TITLE in favor of Plaintiff Joaquin Andres Acosta and against all named Defendants, and all persons unknown now or hereafter before this Honorable Court of Record.

**170.** For the Record, Plaintiff respectfully requests this Honorable Court make its Final Order in the form of a STATEMENT OF FACTS AND CONCLUSION OF LAW.

**171.** This document contains a highly detailed and material 16,320 word count.

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

**172.**   This document is executed by the voluntary act of my own hand in San Bernardino County, in the State of California, and is dated this fourteenth day of the ninth month, in the year two thousand fifteen, Anno Domini, in the two-hundred and thirty-ninth year of the Independence of America.

Joaquin Andres Acosta, in Pro Se
Authorized Representative of
JOAQUIN ANDRES ACOSTA
(Legal distinction being made ON THE RECORD.)
All Rights Reserved
UCC 1-308, Without Prejudice

**VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**

## VERIFICATION

I, Plaintiff Acosta, attest to the truth of the following:

I has read the foregoing **VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta**, and know the contents thereof.

I am a party to the above entitled action or proceeding, and certify that the matters stated therein are facts of my own knowledge.

I declare under the penalty of perjury of the Laws of the California Republic state and *these* United States of the America, that the foregoing is correct and complete to the best of our knowledge, information and belief, and that this verification is executed by the voluntary act of my own hand in San Bernardino County and is dated this fourteenth day of the ninth month, in the year two thousand and fifteen, Anno Domini, in the Two-Hundred and thirty-ninth year of the Independence of the America.

Joaquin Andres Acosta, in Pro Se
Authorized Representative of
JOAQUIN ANDRES ACOSTA
(Legal distinction being made ON THE RECORD.)
All Rights Reserved
UCC 1-308, Without Prejudic

53
VERIFIED CHAPTER 7 ADVERSARY PROCEEDING FOR TRESSPASS ON UNITED STATES LAND
PATENT PRIVATE LAND, SELECTIVE INFORCEMENT AND QUIET TITLE AGAINST ALL
NAMED DEFENDANTS AND IN FAVOR OF PLANITIFF Joaquin Andres Acosta

# *Oath of Office*

**STATE OF CALIFORNIA**
**County of San Bernardino**

I, _David Cohn_ do solemnly swear (or affirm) that I will support and defend the

Constitution of the United States and the Constitution of the State of California against all

enemies, foreign or domestic; that I bear true faith and allegiance to the Constitution of

the United States and the Constitution of the State of California; that I take this obligation

freely, without any mental reservation or purpose of evasion; and that I will well and

faithfully discharge the duties upon which I am about to enter.

_____
*Signature of Candidate*

Subscribed and sworn to before me this _____18_____ day of _AUG_, 2010



_____
*Signature of Officer Administering Oath*

_____
*Judge*
*Title*

# *Oath of Office*

**STATE OF CALIFORNIA**
**County of San Bernardino**

I, __Tara Reilly__ , do solemnly swear (or affirm) that I will support and defend the

Constitution of the United States and the Constitution of the State of California against all

enemies, foreign or domestic; that I will bear true faith and allegiance to the Constitution

of the United States and the Constitution of the State of California; that I take this

obligation freely, without any mental reservation or purpose of evasion; and that I will

well and faithfully discharge the duties upon which I am about to enter.

_____
*Signature of Candidate*

Subscribed and sworn to before me this ____*14*____ day of ___*Dec.*_____, 2012

_____
*Signature of Officer Administering Oath*

_____
*Judge*
*Title*

# THE UNITED STATES OF AMERICA,

## To all to whom these Presents shall come, Greeting:

CERTIFICATE
No. 2480.      *Whereas* Stephen D. Sacks of San Bernardino County, California

ha*s* deposited in the General Land Office of the United States a Certificate of the Register of the Land Office at Los Angeles, California whereby it appears that full payment has been made by the said Stephen D. Sacks

according to the provisions of the Act of Congress of the 24th of April, 1820, entitled "An Act making further provision for the sale of the Public Lands," and the acts supplemental thereto, for the South East quarter of Section six in Township two South, of Range one East, of San Bernardino Meridian in California, containing one hundred and sixty acres

according to the Official Plat of the Survey of the said Lands, returned to the General Land Office by the Surveyor General, which said Tract ha*s* been purchased by the said Stephen D. Sacks

*Now know ye*, That the United States of America, in consideration of the premises, and in conformity with the several Acts of Congress in such case made and provided, have given and granted, and by these presents do give and grant unto the said Stephen D. Sacks

and to his heirs, the said Tract above described: To have and to hold the same, together with all the rights, privileges, immunities, and appurtenances, of whatsoever nature, thereunto belonging, unto the said Stephen D. Sacks and to his heirs and assigns forever; subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local customs, laws, and decisions of courts, and also subject to the right of the proprietor of a vein or lode to extract and remove his ore therefrom, should the same be found to penetrate or intersect the premises hereby granted, as provided by law.

*In testimony whereof I, Benjamin Harrison* President of the United States of America, have caused these letters to be made Patent, and the seal of the General Land Office to be hereunto affixed.

*Given* under my hand, at the City of Washington, the seventh day of May , in the year of our Lord one thousand eight hundred and ninety , and of the Independence of the United States the one hundred and fourteenth

By the President: Benjamin Harrison

By M. McKean , Secretary.

J. M. Townsend , Recorder of the General Land Office.

[L.S.]

CERTIFIED TO BE A TRUE COPY

CERTIFYING OFFICER
PUBLIC INFORMATION SECTION
CALIFORNIA STATE OFFICE
BUREAU OF LAND MANAGEMENT

AUG 0 3 2015

FORM B104 (08/07)                                                              2007 USBC, Central District of California

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Page 2) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| JOAQUIN ANDRES ACOSTA | MATTHEW J. MARNELL et |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| | |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☒ Debtor    ☐ U.S. Trustee/Bankruptcy Admin | ☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin |
| ☐ Creditor    ☐ Other | ☒ Creditor    ☐ Other |
| ☐ Trustee | ☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Civil RICO 18 USC 1962, 1964 (c)

**NATURE OF SUIT**
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☒ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
*AA*  ☒̶ 31-Approval of sale of property of estate and of a co-owner - § 363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☒ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☒ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☒ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☒ Check if a jury trial is demanded in complaint | Demand $ 16,000,000 |

Other Relief Sought

FORM B104 (08/07), page 2                                                      2007 USBC, Central District of California

## BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

| NAME OF DEBTOR | BANKRUPTCY CASE NO. |
|---|---|
| JOAQUIN ANDRES ACOSTA | 6:14-bk-12539 MJ |

| DISTRICT IN WHICH CASE IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| CENTRAL | | MERIDETH JURY |

### RELATED ADVERSARY PROCEEDING (IF ANY)

| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
|---|---|---|
| JOAQUIN ANDRES ACOSTA | MATHEW J. MARNELL et | |

| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
|---|---|---|
| CENTRAL | | MERIDETH JURY |

SIGNATURE OF ATTORNEY (OR PLAINTIFF)

*Joaquin Andres Acosta*

| DATE | PRINT NAME OF ATTORNEY (OR PLAINTIFF) |
|---|---|
| 9-14-2015 | JOAQUIN ANDRES ACOSTA |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 104, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendents.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not presented by an attorney, the plaintiff must sign.